## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **HUMANA INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. _____** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **BIOGEN, INC. (f/k/a BIOGEN IDEC,** | ) | **JURY TRIAL DEMANDED** |
| **INC.) and** | ) | |
| **ADVANCED CARE SCRIPTS INC.,** | ) | |
| | ) | |
| **Defendants.** | | |

## COMPLAINT

### I.     INTRODUCTION

1.      This action arises out of a scheme to lure Medicare and its contract insurers into overpaying for three drugs used to treat multiple sclerosis: Tysabri, Avonex, and Tecfidera (collectively the "MS Drugs").  All three are produced by Defendant Biogen Inc. ("Biogen"), and they cost an eye-popping $50,000 to $80,000 per year.

2.      The purpose of the scheme was to inflate both the number and price of prescriptions for MS Drugs, and thereby increase Biogen's profits.  The scheme operated in two parts.  First, Biogen "seeded" the market by giving away free drugs to patients who lacked insurance coverage for drugs.  The seeding lasted several months or more because Biogen knew that a patient who starts a particular multiple sclerosis therapy is likely to continue that therapy.  This type of seeding conduct is illegal because it interferes with normal insurance incentives to choose a therapy based on medical needs and costs.  In the particular context of Medicare, the federal government has long advised companies that programs which could be viewed as seeding are likely to violate criminal anti-kickback laws.  Biogen knew that this conduct was illegal but pursued it anyway.

3.     Having seeded the market, Biogen then implemented the second part of its scheme: "sweeping" the patients from its free-drug program into Medicare or other government-funded healthcare programs and then—critically—funneling illegal copayment assistance to those same patients under the guise of unrestricted charitable giving.  For this part of the operation, Biogen coordinated with another specialty pharmacy, defendant Advanced Care Scripts Inc. ("ACS"), which steered patients and acted as an information intermediary, as well as two nominally charitable foundations, Chronic Disease Fund Inc. ("CDF") and The Assistance Fund Inc. ("TAF").  Together, Biogen and its collaborators carefully calibrated Biogen's grants for patient assistance—supposedly made without regard to which drug or manufacturer would benefit—so that patients using Biogen's MS drugs would only or primarily benefit from the grants.

4.     This too was illegal, and again Biogen knew it.  In nearly every kind of insurance coverage, including those at issue here, patients bear some financial responsibility for their coverage through copayments, coinsurance, or deductibles (collectively "copays").  Patient responsibility is a safeguard against moral hazards such as fraud and overuse.  In the Medicare context in particular, it is a purposeful, congressionally designed protection against overspending.  Given the high costs of the MS Drugs here, copays can be thousands of dollars for any single patient.  But they are a tiny fraction of the total expense for the drugs.  This means that if the manufacturer pays the copays itself, it can earn a major return from a minor investment.  Federal law therefore deems it a kickback, since the manufacturer's small investment in the co-pay assistance generates huge returns in the form of price reimbursements by third-party payors.  Those payors include taxpayers (through Medicare) and private insurers

of Medicare Part D and Medicare Advantage plans. The injured party here, Plaintiff Humana

Inc. ("Humana"), is just such an insurer.

5.     Though the co-pay funding payments was ostensibly for MS funds that could be

used for any manufacturer's drug, the scheme was designed and carried out in such a way as to

benefit only Biogen and its confederates—in other words, to create the false appearance of a

general charitable donation that was in fact a kickback. Biogen paid the foundations with the

intent and understanding that they would use Biogen's money specifically to cover the copays of

patients taking Biogen's MS Drugs. In so doing, Biogen intended that the MS Drug patients—

but not insurers—avoid the steep prices charged for the drug.

6.     Biogen and its conspirators knew this and used their scheme to reap millions of

dollars at the expense of insurers, with the effect of encouraging further use of the MS Drugs

over cheaper alternatives and shifting the enormous remaining cost of the drugs to insurers and

the government. Biogen and its collaborators used this scheme to reap substantial, but

fraudulent, profits for years.

7.     It was, in short, a fraud, and it caught the attention of the United States

Department of Justice ("DOJ"). In December 2020, DOJ intervened in a whistleblower suit

against Biogen captioned *United States, et al., ex rel. Paul Nee v. Biogen Inc., et al.*, No. 17-cv-

10192 (D. Mass.) and struck a $22 million deal to settle the allegations in that complaint with the

company. *See* https://www.justice.gov/opa/pr/biogen-agrees-pay-22-million-resolve-alleged-

false-claims-act-liability-paying-kickbacks. In the relator's complaint, it was alleged that

Biogen's conduct in connection with Tysabri, Avonex, and Tecfidera violated the federal Anti-

Kickback Statute, 42 U.S.C. § 1320a-7b, and False Claims Act, 31 U.S.C. §§ 3729-3733. The

settlement of the Biogen complaint followed settlements with Biogen's co-conspirators: in

November 2019, the Justice Department reached a settlement in which TAF agreed to pay $4 million in exchange for a release of claims for the covered conduct, as well as similar conduct involving other manufacturers and pharmaceutical products, *see* https://www.justice.gov/usao-ma/press-release/file/1218686/download, which was shortly after CDF agreed to pay $2 million for related conduct, *see* https://www.justice.gov/usao-ma/press-release/file/1212996/download. The United States Department of Health and Human Services, Office of the Inspector General ("OIG") also exercised its supervisory authority, requiring TAF and CDF to enter into separate "Integrity Agreements" designed to reform the foundations' practices and ensure future compliance with the law.  When it announced its settlement with Biogen, DOJ also announced that ACS had paid $1.4 million to resolve its role in the same conduct.

https://www.justice.gov/opa/pr/biogen-agrees-pay-22-million-resolve-alleged-false-claims-act-liability-paying-kickbacks.

8.      In addition to their illegality, Biogen and ACS committed civil wrongs directly against Humana.  Specifically, both Defendants caused the submission of false certifications to Humana, thereby injuring Humana and causing it to pay millions of dollars in reimbursements for the MS Drugs that Humana would not have otherwise paid.  From 2011 through 2019, Humana spent over $2.3 billion on Biogen's MS Drugs.  This suit seeks recovery of Humana's overpayments.

## II.    PARTIES

### A.  Humana

9.      Plaintiff Humana Inc. is a Delaware corporation with its principal place of business in Louisville, Kentucky.  Humana and its operating subsidiaries provide health insurance, including for prescription drug costs, for more than eight million members in all 50 states, the District of Columbia, and Puerto Rico.  More than 75% of Humana's total premium

4

revenues from 2011 through 2019 were derived from government-led insurance programs, including Medicare Part D prescription drug coverage, Medicare Advantage plans, Tricare plans for service members, and Medicaid plans.

10.     Humana's operating subsidiaries include: Arcadian Health Plan, Inc.; CarePlus Health Plans, Inc.; Cariten Health Plan, Inc.; Cariten Insurance Company; CHA HMO, Inc.; CompBenefits Insurance Company; Emphesys Insurance Company; Health Value Management, Inc. d/b/a ChoiceCare Network; Humana Behavioral Health, Inc.; HumanaDental, Inc.; Humana Benefit Plan of Illinois, Inc.; Humana Employers Health Plan of Georgia, Inc.; Humana Health Benefit Plan of Louisiana, Inc.; Humana Health Company of New York, Inc.; Humana Health Insurance Company of Florida, Inc.; Humana Health Plan of California, Inc.; Humana Health Plan of Ohio, Inc.; Humana Health Plan of Texas, Inc.; Humana Health Plan, Inc.; Humana Health Plans of Puerto Rico, Inc.; Humana Insurance Company; Humana Insurance Company of Kentucky; Humana Insurance Company of New York; Humana Medical Plan of Michigan, Inc.; Humana Insurance of Puerto Rico, Inc.; Humana Medical Plan of Pennsylvania, Inc.; Humana Medical Plan of Utah, Inc.; Humana Medical Plan, Inc.; Humana Pharmacy, Inc.; Humana Pharmacy Solutions, Inc.; Humana Regional Health Plan, Inc.; and Humana Wisconsin Health Organization Insurance Corporation (collectively, the "Operating Subsidiaries").

11.     Humana Pharmacy Inc. and Humana Pharmacy Solutions, Inc. operate Humana's in-house pharmacy and manage Humana's pharmacy benefits, respectively.  All of the other Operating Subsidiaries are "organized and licensed under State law" of their respective states of incorporation "as a risk-bearing entity eligible to offer health insurance or health benefits coverage in each State in which it offers a Medicare+Choice plan."  42 U.S.C. § 1395w–25(a)(1).  All of the Operating Subsidiaries have assigned the claims asserted here to Plaintiff

Humana Inc. through written assignment agreements.  Under the agreements, the Operating

Subsidiaries "irrevocably assign[ed] all rights, titles, and interests in the Claims to Humana."

For purposes of this Complaint only and unless otherwise noted, Humana Inc. and the Operating

Subsidiaries are referred to collectively as "Humana."

### B.  Biogen

12.     Defendant Biogen is a Delaware corporation with its principal place of business at

225 Binney Street, Cambridge, MA 02142.  It is one of the largest biotechnology companies in

the world, with a market capitalization of approximately $60 billion and 2017 revenues

exceeding $13 billion.

### C.  ACS

13.     Defendant Advanced Care Scripts, Inc. is a Florida corporation with its principal

place of business in Cincinnati, Ohio.  ACS is a subsidiary of Omnicare Inc., which in turn is a

subsidiary of publicly traded CVS Health Corporation.  ACS is a specialty pharmacy that also

provides patient-management services to the pharmaceutical industry.  ACS was founded and

run by Jeffrey Spafford and Edward Hensley before being sold to Omnicare Inc.

### III.    CO-CONSPIRATORS

### A.  TAF

14.     The Assistance Fund Inc. is a Delaware not-for-profit corporation with its

principal place of business in Orlando, Florida.  TAF's primary purpose is to provide copay

assistance for expensive pharmaceuticals, including the MS Drugs.  TAF was founded by

Messrs. Spafford and Hensley.

### B.  CDF

15.     Chronic Disease Fund, Inc. is a is a New Jersey not-for-profit corporation with its

principal place of business in Frisco, Texas.  CDF currently does business under the name Good

Days.  CDF's primary purpose is to provide copay assistance for expensive pharmaceuticals, including the MS Drugs.

## IV.    JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States, including the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.

17.    This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. § 1965 because they reside, are found, have an agent, or transact their affairs in this district.

18.    This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over violations of state law, including state common-law claims.

19.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c), and 18 U.S.C. § 1965.  A substantial part of the events giving rise to this action occurred in this judicial district, in particular because Biogen is located in this district.

## V.    FACTS

### A.  Legal Framework

20.    <u>Medicare</u>.  Congress established Medicare in 1965 to provide health insurance coverage for people aged sixty-five or older and for people with certain disabilities or afflictions. Medicare is administered by the Centers for Medicare & Medicaid Services ("CMS"), a division of the United States Department of Health and Human Services.

21.    Medicare consists of four parts: A (hospital insurance), B (medical insurance), C ("Medicare Advantage," formerly known as "Medicare+Choice," under which Part A and B coverage is provided by private companies such as Humana), and D (prescription drug coverage, except as covered through one of the other parts).

22.     Medicare Part A generally pays for inpatient services for eligible beneficiaries in hospitals, hospices and skilled nursing facilities, as well as some home healthcare services. 42 U.S.C. §§ 1395e - 42 U.S.C. §§ 1395i-5.  Prescription drugs are covered under Medicare Part A if they are administered on an inpatient basis in a hospital or similar setting.

23.     Medicare Part B covers some healthcare services and products not covered by Medicare Part A, generally on an outpatient basis.  Doctor's visits and other services are covered by Part B. Medicare Part B also pays for some types of prescription drugs that are not administered in an inpatient hospital setting, typically drugs administered by a physician or other provider in an outpatient setting.  42 U.S.C. § 1395k(a); 42 U.S.C. § 1395x(s)(2); 42 C.F.R. § 405.517. As set forth further below, Tysabri is typically administered in this way.

24.     Medicare Advantage/Part C provides the same coverage as supplied under Parts A and Part B, except that it is provided by private insurers under contract with CMS.  Patients may also contract with Medicare Advantage insurers for coverage beyond that which is required to be provided under Medicare Parts A and B. Many Medicare Advantage plans also include prescription drug coverage similar to that offered separately on Medicare Part D plans. Humana is a provider of Medicare Advantage plans.

25.     Medicare Part D was launched in 2006 as a voluntary prescription drug benefit program for Medicare enrollees.  Under this program, Medicare likewise contracts with insurers such as Humana, known as Part D Plan Sponsors, to administer prescription drug plans.  *See* 42 C.F.R. § 423.4.  Premiums for Part D plans are split between insureds and Medicare funds generated from taxpayers.  The administration of Part D plans is regulated by CMS, pursuant to one-year, annually renewable contracts.  Part D Sponsors enter into subcontracts with pharmacies or other "downstream entities" to provide prescription drugs to the Medicare Part D

insureds enrolled in their plans.  Pharmacies then contract directly with pharmaceutical companies or indirectly through drug distributors to acquire the prescription drugs for Medicare insureds.  Humana is a provider of Medicare Part D plans.

26.     Under enabling legislation and relevant regulations, a Part D beneficiary may be required to make a partial payment for the cost of prescription drugs in the form of a copayment, coinsurance, or deductible.  *See* 42 U.S.C. § 1395w-102.  The copays can be substantial for expensive medications and vary throughout the year, depending on a beneficiary's total Part D covered expenses incurred that year up to that point.  The patient responsibility for prescription drug costs under Medicare can vary between 5% and 100% of the cost of the drug, meaning that patients who take expensive medications like the MS Drugs are often responsible for thousands of dollars in out-of-pocket costs for that drug alone, in addition to costs for other prescriptions that they may need.

27.     When a pharmacy dispenses drugs to a Humana Part D member, the pharmacy submits a claim to Humana, which in turn submits an electronic record of the claim, called a Prescription Drug Event ("PDE"), to CMS.  After dispensing the drug, the pharmacy receives reimbursement from Humana for the portion of the drug cost not paid by the Part D member at the point of sale.  Generating and submitting PDE data is a condition of payment for CMS's provision of Medicare funds to Part D Plan sponsors.  *See* 42 C.F.R. § 423.322.

28.     Any "downstream" or "related" entities that subcontract with Medicare Part D Plans (including pharmacies dispensing medication and manufacturers selling medication) are required to comply with "[f]ederal laws and regulations designed to prevent fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law, the False Claims Act (31 U.S.C. § 3729, *et seq*.) [the "FCA"], and the anti-kickback statute (§ 1127B(b) of

the Act)," *id.* § 423.505(h)(l), and all other federal laws, regulations, and CMS instructions, as well as any additional contractual obligations assumed by the Part D Plan.  *Id.* § 423.505(i)(3).

29.    CMS regulations require "downstream" entities that generate and submit PDE claims data to certify that such data is true, accurate, and complete and that the PDE data is the basis for obtaining federal reimbursement for the healthcare products or services reflected therein.  *Id*. § 423.505(k).  Congress has determined that any Medicare claim "that includes items or services resulting from a violation of [the Anti-Kickback Statute] constitutes a false or fraudulent claim for purposes of [the False Claims Act]."  42 U.S.C. § 1320a-7b(g).

30.    Under Medicare Part C, the plan is compensated at a capitated rate for each insured.  Therefore, Part C plan sponsors do not submit claims directly to the federal government but are instead required to submit aggregated data on expenditures in connection with the calculation of their bids to be Medicare plan sponsors in future plan years. *See* 42 CFR § 422.250, *et seq*.  Irrespective of the lack of a direct claim submission, all "downstream" entities that provide goods or services covered by Medicare Advantage plans are legally required to agree to comply with "Medicare laws, regulations, and CMS instructions" which include the same "[f]ederal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to" the FCA and the AKS.  *Id.* § 422.504.

31.    The Anti-Kickback Statute.  The Medicare-Medicaid Anti-Fraud and Abuse Amendments, known as the Anti-Kickback Statute (the "AKS"), 42 U.S.C. § 1320a-7b(b), provide criminal penalties for individuals or entities that knowingly and willfully offer, pay, solicit or receive remuneration to induce the referral of business reimbursable under a federal health benefits program.  *Id*. "Remuneration" is broadly defined to include anything of value

directly or indirectly, overtly or covertly, in return for purchasing, ordering, or recommending the purchase or order of any reimbursable item.  *Id.*

32.     Medicare copays exist to encourage physicians and beneficiaries to be efficient consumers of federally reimbursed healthcare products, while also encouraging those manufacturing such products to price them based on market forces such as affordability to consumers and competition from other medications, including lower-cost generic drugs. Manufacturers paying the Medicare copays of those seeking to buy their drug circumvent this congressionally designed check on healthcare costs.  As OIG has observed, drug manufacturers paying the Medicare Part D copays of patients taking their products "eliminat[e] a market safeguard against inflated prices."  OIG, Special Advisory Bulletin on Patient Assistance Programs for Medicare Part D Enrollees, 70 Fed. Reg. 70623, 70625-26 (Nov. 22, 2005) (the "2005 Special Advisory Bulletin").  In other words, charging the Medicare system tens of thousands of dollars while presenting those same drugs to Medicare insureds as free induces insureds to use those drugs over cheaper pharmaceutical and non-pharmaceutical alternatives.

33.     The 2005 Special Advisory Bulletin explicitly warned against precisely the circumstance that arose in this case:

> Subsidies provided by traditional pharmaceutical manufacturer PAPs have the practical effect of locking beneficiaries into the manufacturer's product, even if there are other equally effective, less costly alternatives (and even if the patient's physician would otherwise prescribe one of these alternatives). Subsidizing Medicare Part D cost-sharing amounts will have this same steering effect. Moreover…cost-sharing subsidies can be very profitable for manufacturers, providing additional incentives for abuse. So long as the manufacturer's sales price for the product exceeds its marginal variable costs plus the amount of the cost-sharing assistance, the manufacturer makes a profit. These profits can be considerable, especially for expensive drugs for chronic conditions. <u>We are concerned that pharmaceutical manufacturers may seek improperly to maximize these profits</u> by creating sham "independent" charities to operate PAPs; <u>by colluding with independent charity programs to ensure that the</u>

<u>manufacturer's contributions only or primarily benefit patients using its products</u> (discussed in more detail below); or by manipulating financial need or other eligibility criteria to maximize the number of beneficiaries qualifying for cost-sharing subsidies.

*Id*. at 70626 (emphasis added).

34.     OIG also advised against "seeding programs" of the kind that occurred here.  In a 2008 advisory opinion, OIG specifically warned against "problematic programs that offer free goods or other remuneration to prescribers as a means to 'seed' or introduce new products into the marketplace."  OIG Advisory Opinion No. 08-04 (Feb. 5, 2008) (the "2008 AO"), at 6.  The policy concern was identical to that arising here, namely "the risk of steering associated with starting patients on a particular course of treatment."  *Id*.  Though OIG did not sanction the proposed arrangement, it considered the risks of prohibited remuneration mitigated by other factors not present here, such as that "Medicare patients who choose to stay on the Medication after the one-time trial supply will still be responsible for substantial cost-sharing amounts, so the Proposed Arrangement offers no ongoing financial incentive to use the Medication."  *Id*.

35.     <u>Certifications of Compliance</u>.  In order to effectuate their scheme and as described further below, Defendants misrepresented to Humana that they were complying with state and federal law, including laws related to kickbacks and false claims such as the AKS and the FCA.

36.     Biogen and its agent ACS made such certifications and therefore directly misrepresented to Humana that they were not inducing Medicare patients to take Biogen's drugs by subsidizing copayments, and that Biogen and ACS were otherwise complying with federal law.  Biogen also made contractual representations to Humana in connection with its non-Medicare insurance policies that it would comply with the laws including, among others, those related to fraud, abuse, and prohibiting kickbacks.

### B.  Humana

37.     Humana operates or administers Medicare Part D insurance plans on behalf of the federal government for millions of members.  Humana also provides coverage for pharmaceuticals, including the MS Drugs, through other plans, including Medicare Advantage (Medicare Part C), Tricare, Medicaid, and commercial health insurance plans.  Through its administration of these plans, Humana bears significant risks that the costs and utilization of healthcare services will rise.  When Humana assumes these risks, it relies in large part on the protections afforded by law against submissions of false or fraudulent claims to government healthcare providers.

38.     Humana's agreements with its providers include a provision that requires the provider to certify its compliance with state and federal law, as well as rules promulgated by government entities such as CMS.  These contractual provisions are essential for Humana to ensure that it receives prompt payments and reimbursements from CMS for valid claims, and to ensure that it does not pay invalid claims that might increase costs to both itself and Medicare. Humana also relies on these representations in approving not only Medicare, but also commercial insurance claims and claims under other plan types for payment.

### C.  The MS Drugs

39.     According to the company's internal documents, Biogen drugs were used to treat 47.3% of MS patients in the United States in June 2014, with the market share expected to pass 50% in 2015.  These drugs cost between $50,000 and $80,000 per year. In 2015, for example, the three drugs at issue here—Avonex, Tecfidera and Tysabri—accounted for more than $8.4 billion in Biogen's revenues. This revenue included billions of dollars in Medicare claims, Medicaid claims, and other government-funded coverage claims.

40.     <u>Avonex</u>.  Biogen's drug Avonex is a prescription medicine used to treat relapsing forms of MS in adults, including disease courses such as relapsing-remitting MS (RRMS), clinically isolated syndrome (CIS) and active secondary progressive MS (SPMS).  Avonex can be self-administered through an injection pen, but can also be administered by a doctor, who mixes a powder form of the drug into an injectable form and then injects the patient with the correct dosage.  Typically the patient takes Avonex once every week.

41.     During 2015, a month supply of Avonex cost $5,300, and therefore an annual course of treatment cost approximately $63,600.  During the period from 2011 to 2015, Humana spent more than $487 million on Avonex.  Approximately $414 million of this amount was spent for coverage under Medicare Parts C and D.

42.     <u>Tysabri</u>.  Biogen's drug Tysabri is also a drug indicated for treatment of RRMS.  Tysabri is not self-administered, but rather infused intravenously by a medical provider over one hour every four weeks.  A medical visit is therefore required for administration.

43.     During 2015, a single infusion of Tysabri cost about $5,350, and therefore an annual course of treatment cost approximately $64,000.  During the period from 2011 to 2015, Humana spent approximately $145 million on Tysabri.  Over $77 million of this amount was spent for coverage under Medicare Parts C and D.

44.     <u>Tecfidera</u>.  Biogen's drug Tecfidera is a prescription medicine used to treat relapsing forms of MS in adults, including RRMS, CIS, and SPMS.  Tecfidera is self-administered in capsule form, with two capsules taken per day.

45.     During 2015, a month supply of Tecfidera cost $5,875 and therefore an annual course of treatment cost approximately $70,500.  During the period from 2011 to 2015, Humana

spent approximately $298 million on Tecfidera.  Over $245 million of this amount was spent for coverage under Medicare Parts C and D.

### D.  Biogen's Scheme

46.     Biogen had a two-part scheme that, in conscious coordination with its conspirators, it used to inflate both the number and price of prescriptions of the MS Drugs.  In the first part of the scheme, Biogen would provide free drugs to thousands of patients who either lacked insurance coverage or whose coverage did not extend to the MS Drugs, knowing that a patient who starts a particular therapy is likely to continue on that therapy.

47.     In the second part of the scheme, Biogen would steer or "sweep" those patients into Medicare or Medicare Advantage programs, which would reimburse Biogen for the cost of the drugs.  Biogen would then address the problem (from Biogen's standpoint) of patient copays, since patients who lacked insurance before the sweep would likely either discontinue use of the MS Drugs (including by switching to alternative medications) when confronted with the copays that they did not have to pay when receiving the drugs for free.  Then came the critical part of the scheme: Biogen would work with ACS to coordinate donations with sham patient assistance programs ("PAPs")—in particular CDF and TAF—so that Biogen's donations would be used for the MS Drugs while appearing to have been unrestricted.

48.     For the sake of clarity, Humana does not allege or contend that manufacturer support of copay assistance is inherently improper or that drug manufacturers are barred from making genuinely charitable donations for copay assistance.  The misconduct arises when, as here, the manufacturer pays for *its own* drugs to the exclusion or preference of others under the *guise* of general-purpose charity.  That conduct is deceptive on its face—it is designed to hide a kickback—and has long been considered unlawful.  As noted above, OIG's 2005 SAB specifically warned against pharmaceutical manufacturers creating "sham" charities or colluding

with independent charities to ensure that their contributions benefitted only or primarily their own drug.

49.     But that conduct is also lucrative.  The manufacturer's small investment in the patient's copay is returned many times over when the insurer reimburses the manufacturer for the remaining cost of the drugs.  Biogen was seduced by that prospect and intended that outcome here.  The cost of goods sold for Biogen's drugs (or more precisely, "initially given away and then sold") is only around 2% of their retail price.  The cost of copay assistance is likewise a low percentage of Biogen's ultimate revenue for the MS drugs, in the case of Medicare the copay component is at most 5-10% of the MS Drugs' retail prices.  Biogen's two-step scheme therefore returned handsome profits by a mechanism that would not have been feasible were it publicly disclosed.  Indeed, most of the specifics about Biogen's scheme remain hidden to this day.

50.     This underlying misconduct results in a further form of misconduct specifically directed to Humana: namely, specific misrepresentations that those participating in the deceptive scheme were complying with the very laws that they were in fact flouting.

51.     Part I: Seeding and Sweeping.  Biogen began its scheme by targeting patients for free drugs.  For that purpose it shipped the specialty MS Drugs to patients through US Bioservices, which distributes only free drugs.

52.     Biogen's internal documents show that from 2013 through 2015, the percentage of patients taking the MS Drugs through the free-drug program was substantial but decreased over time as patients were swept into coverage and as Biogen tried to decrease its legal exposure. For example, the percentages ranged from:

16

| Tecfidera | 20.3% (2013 Q3) to 9.9% (2015 Q4) |
| Tysabri | 11.5% (2013 Q1) to 7.8% (2015 Q4) |
| Interferon[1] | 11.5% (2013 Q2) to 7.5% (2015 Q4) |

As shown by the fact that even the lower range of these numbers is substantial, the shipped drugs were not merely samples or 30-day supplies.  The free-drug program provided as much as a year's worth of product and occasionally more, if a patient was not eligible to be swept into insurance coverage that would increase Biogen's costs.

53.     Biogen knew this would capture patients because having begun a medication, patients are likely to stay on it.  Biogen's internal documents stress that as much as 70% of patients "will change their behavior based on the lack of copay assistance" or free drugs.  As evidence that this was a knowing strategy, when hemophilia drug Alprolix was being launched in early 2014, Biogen anticipated providing free drugs to as many as 51% of the patients that started therapy on it in order to capture as many patients as possible.  Biogen's CEO George A. Scangos, CFO Paul Clancy, and Vice Presidents of Commercial Operations, Marketing, Sales, Patient Services, and U.S. Analytics were aware of and supported Biogen's government-programs sweeps.

54.     Biogen also anticipated that a large portion of patients in Biogen's free-drug program would eventually obtain either government or commercial coverage, thereby providing a vehicle for reimbursement of the costs.  In a November 2014 presentation prepared for Biogen by a third-party, Biogen was informed that an estimated 32.7% of MS patients are covered by Medicare, another 10.7% by Medicaid, and another 3.7% by VA/Tricare and that "Medicare is expected to become the dominant payer for people with MS."  Either through third parties or in-

---

[1] For economic and certain other purposes, Biogen sometimes classifies Avonex with its other interferon drugs, though Avonex is principal among these.

house, Biogen performed thousands of "Benefits Investigations" or "BIs," to determine if and when patients in Biogen's free-drug program could be converted to paying customers. For example, a February 6, 2015 Biogen PowerPoint entitled "Tecfidera Brand Leadership Meeting" praised Biogen's Patient Services Department ("PSD") for completing more than 12,000 Benefit Investigations to determine coverage for patients in Biogen's free-drug program since the beginning of that year.

55.     The free-drug program was illegal remuneration to patients to induce them to take the MS Drugs, so that they would later submit claims for those drugs to Humana and other payors for payment, an impermissible seeding program that violates the AKS.

56.     Part II: Sham "Charitable" Copay Assistance.  Biogen recognized that out-of-pocket costs were a significant factor influencing whether patients were receptive to the MS Drugs in the first place and whether they adhered to the MS Drugs after being swept out of the free-drug program.  If out-of-pocket costs were high, then patients would forego the MS Drugs in favor of less expensive MS therapies, including generic drugs.  The high prices Biogen charged for the MS Drugs resulted in correspondingly high out-of-pocket costs: because an annual course of treatment could cost $50,000-$80,000 per year, patients had to pay thousands of dollars annually in out-of-pocket costs for the MS Drugs alone.  This is on top of the already substantial medical expenses associated with managing a terrible disease like MS.

57.     Instead of lowering the price, Biogen subsidized only the comparatively small patient portion while leaving insurers to pay the substantial balance.  Because paying copayments of Medicare insureds violates the AKS and the FCA, Biogen directed patients to charitable foundations that funneled Biogen's donations to copay assistance for Biogen's own MS Drugs.  By doing so, Biogen mollified patient concerns about copays while simultaneously

shifting the high costs of the MS Drugs to Medicare/Medicare Advantage payors such as Humana.

58.     Biogen understood that the charitable veneer of its contributions to the foundations was a sham.  Its business personnel understood that it made these payments expecting to receive a return on investment in the charitable foundations.  Biogen knew that if it did not undertake this activity, MS Drugs sales would decrease.  This was particularly so because Biogen had accustomed patients to receiving their drugs for free.

59.     The scheme generally operated as follows.  First, Biogen's PSD (or a third-party vendor) performed benefits investigations to identify which patients in the free-drug program were eligible for Medicare or other government-funded programs.  Patients were then contacted to obtain their consent to being placed on the program, and were advised that the change would cost them nothing.

60.     Next, PSD coordinated with the PAPs to ensure that there would be copay coverage for eligible patients.  In a direct *quid pro quo*, the PAPs committed to cover specific patients' copays in amounts based on grants that Biogen made to the PAPs.  Within a day or two of when the grants were given to the PAP, the former free-drug recipients were swept to Medicare and enrolled in that charity's PAP, which then funds those patients' copays.

61.     The PAPs and Biogen carefully coordinated with each other.  On the one side, the PAPs provided Biogen with extremely detailed information in the form of dashboards and regular status reports.  On the other, Biogen tracked every prescription and knew precisely which Medicare and Medicaid prescriptions were covered by a PAP.  One Biogen spreadsheet identifies primary and secondary payors for each prescription, including prescriptions paid for by Medicare that had a PAP as the secondary payor.  For Tysabri, Biogen also relied for information on its

Risk Evaluation and Mitigation Strategy (REMS) program under FDA protocols that include the collection of patient-specific data for drugs with greater safety risks.

62.     Finally, Biogen would coordinate with US Bioservices to ensure a smooth transition from free drugs to drugs with subsidized patient copays.  US Bioservices would ship an extra 60- to 90-day supply as the final shipment of free goods, and would then transfer the patients to a new specialty pharmacy.

63.     Timing was important to this process in two respects.  First, the copay assistance for Biogen's newly enrolled patients followed in close proximity to Biogen's grants.  Second, for Biogen drugs reimbursed under Medicare Part D, the sweeps began at the end of the year and were completed by the beginning of the new year.  This timing was driven by PSD personnel (including employee K.U.) who knew that regulations preclude a patient from being eligible for Medicare Part D in any calendar year in which they have received free goods.

64.     Biogen did not always or necessarily need to communicate directly with the PAPs.  For example, in 2011, Biogen paid copays for Avonex patients through CDF but coordinated such payments through ACS.  Biogen gave specific information about patients to ACS, which then sent CDF "batch files" of applications for Medicare-eligible Avonex patients.  ACS also transferred those patients from Biogen's free-drug program to CDF.  After receiving Biogen's payment, CDF approved the patients' applications and covered the costs of their copays.  Medicare (and Medicare insurers like Humana) would then reimburse Biogen for the remaining—and very sizeable—portion of the drug cost that was not paid by the copay.

65.     In 2012, Biogen repeated this process for Tysabri.  It made payments to TAF's MS fund on May 24 and July 17, 2012, as part of a coordinated effort by TAF and Biogen to use Biogen's money to cover Medicare co-pays for Tysabri patients.  In an e-mail to a Biogen vice

president, TAF's co-founder referred to the "TYS[abri] project," reflecting both Biogen's and TAF's understanding that when its MS fund opened after each of these two Biogen payments, ACS would immediately send a "batch file" of Medicare co-pay assistance applications for Tysabri patients. As a result, when TAF's MS fund opened after Biogen's payments on May 24 and July 17, 2012, Tysabri patients received copay grants from the funds that Biogen had contributed. TAF then reported to Biogen, both directly and through ACS, TAF's success in directing Biogen's funding to Tysabri patients.

66.     Similarly, in 2013, Biogen again identified Medicare-eligible patients for transfer from the free-drug program to TAF and paid TAF through the veneer of grants and worked with ACS to transfer those same patients to TAF.  At Biogen's direction, ACS then sent TAF "batch files" of Medicare-eligible Tysabri patients.  After receiving Biogen's payment, TAF paid those patients' copays for Tysabri.

67.     In 2013, Biogen employed the same process for Tysabri with CDF as it had with TAF: it identified Medicare-eligible patients for transfer from the free-drug program to CDF; it then paid CDF and worked with ACS to transfer those same patients to CDF; at Biogen's direction, ACS then sent CDF batch files of Medicare-eligible Tysabri patients; and after receiving Biogen's payment, CDF paid those patients' copays for Tysabri.

68.     Similarly for Tecfidera, in 2015 Biogen prepared a return on investment (ROI) analysis of charity donations for 2014 Q4 so as to justify continuing the sweeps.  The ROI analysis showed that the company anticipated their PAP "yield" to be 90%, meaning 90% of Biogen's contribution to the PAP would be directed to patients taking Biogen products.  The expected ROI was $18 for every dollar granted to the "charity."

69.     Though Biogen's contributions to CDF and TAF were nominally available to any MS patient who met specified criteria, in reality the donations were orchestrated to ensure that the only patients who benefitted from them took the MS Drugs rather than other multiple sclerosis drugs.  This was done with the knowledge and support of the foundations, who derived substantial administrative fees from Biogen's contributions.  It was also supported by Biogen's co-conspirator ACS, whose participation was intended to insulate Biogen from legal risk and to conceal the true purpose of Biogen's contributions.

70.     ACS aided and abetted Biogen's scheme because it too had something to gain—namely, revenue both from fees (for managing the MS Drugs and transitioning the patients to the PAPs) and from filling prescriptions of the MS Drugs through its specialty pharmacy.  The coordination was also facilitated by the close ties between ACS and TAF.  ACS's co-founders, Messrs. Spafford and Hensley, also founded TAF, which was modeled after CDF.

### E.  Knowledge, Understanding, and Intention

71.     Biogen and its co-conspirators knew that federal law prohibited Biogen from covering a Medicare patient's copay directly.

72.     In addition to facts set forth elsewhere in this Complaint, Biogen knew this because its employees were aware of OIG guidance that prohibited a manufacturer from exercising control over patient assistance programs for Medicare insureds, including OIG's 2005 Special Advisory Bulletin.  In the 2005 Special Advisory Bulletin, OIG advised that the Anti-Kickback Statute applied to payments by pharmaceutical manufacturers to patients through foundations, and emphasized that a foundation "must not function as a conduit for payments by the pharmaceutical manufacturer to patients," and that a pharmaceutical manufacturer should not "solicit or receive data from the charity that would facilitate the manufacturer in correlating the

amount or frequency of its donations with the number of subsidized prescriptions for its products."  70 Fed. Reg. at 70626-27.

73.     Furthermore, Biogen explicitly decided how much in grant money to award by reference to a return on its investment.  Biogen's PSD transmitted details of the grant figures and government-program sweeps to Biogen's Finance department, which provided the details of the expected revenue yield to the director of U.S. forecasting for all Biogen drugs so that he could incorporate them into his revenue forecasts.  For example, one 2012 analysis explained that there was a $4.5 million upside in revenue for Avonex due in part to "[i]mproved execution on Access program," which swept 500 patients more than had been forecast.

74.     Biogen's knowledge is also demonstrated by its timing of the sweeps.  For example, in a November 20, 2013 email, Biogen's Senior Program Lead for Tecfidera explained to the Associate Director of Access Strategy in PSD that there would be a "spike" in Tecfidera shipments in December because "[h]istorically, we have our PAP provider send a double shipment to provide PAP patients with enough free product to last through the end of Jan[uary]." An internal March 22, 2015 PowerPoint called "Tecfidera Patient Analysis" similarly explained that 90-day supplies of free drugs were being sent to Medicare patients at the end of 2014 "so there would be no gap in therapy."

75.     When presented graphically, the sweeps are easier to identify.  For example, PSD conducted sweeps for Avonex at the end of December 2013 and the end of December 2014.  In the chart below, Medicare-eligible patients on the free-drug program (represented by the dark blue bars) drop significantly in January 2014 (2,879 to 1,007) and January 2015 (1,288 to 311):

**Free Drug Counts**



76.    For Tysabri, the sweeps occurred more frequently during the year because as a drug administered by a physician and therefore covered under Medicare Part B, Tysabri patients were not subject to the same constraints under Medicare Part D prohibiting benefits in the same calendar year that free drugs were being sent to Medicare patients at the end of 2014 "so there would be no gap in therapy."  Even so, there was an overall sweep of at least 1,600 patients in 2013 and more than 500 patients in 2014:



77.    In 2014, unlike the usual pattern where the number of Medicare-eligible free-drug patients decreased at year end, the number of patients actually increased because US Bioservices had shipped new orders of free drugs in January 2014 to Medicare Part D patients.  Because of the calendar-year rule, they could not be swept to Medicare the same year.  But at the end of

2014 and beginning of 2015, the pattern repeated itself, and the numbers dropped again when

Biogen swept more than 3,300 patients taking Tecfidera to Government Programs:



78.     Biogen's knowledge is further demonstrated by the efforts it made to obscure the

fact that it was sweeping—especially after news in December 2013 of a federal investigation into

the relationship between CDF and another pharmaceutical manufacturer.  For example, the

supervisor of Biogen's director of U.S. forecasting (and a direct report to the CEO) instructed the

director to stop using the term "sweep" in presentation decks or conversations, and instead to use

the term "patient mix," referring to the ratio between patients on the free drug program and those

whose insurance pay for the drugs.  At a subsequent meeting attended by several high-level

executives, one referred to "sweeps" in discussing 2015 forecasts and was rebuked for it by the

CFO—who nevertheless indicated the next day that more patients should be swept into

government programs.  Biogen has used other terms and euphemisms for sweeping, such as

"free-to-commercial," "conversions," "transitions," "commercial optimization," "Access

Initiative," and "Incremental Access Sweep."  Biogen nevertheless persisted in its sweeps.

79.     ACS and the other co-conspirators likewise had knowledge of the OIG guidance

documents.  The foundations (TAF and CDF) in particular were aware of the OIG's

requirements, which are publicly available, *see*, *e.g.*, https://oig.hhs.gov/compliance/alerts/

bulletins/index.asp, and because both OIG and state attorneys general regularly issued opinion

letters and other guidance to charitable foundations about compliance with state and federal law. The foundations failed to abide by the guidance they received from the OIG.

### F.  Use of the Mail and Wires

80.     Throughout the relevant period, Biogen, ACS, CDF, and TAF used thousands of mail and interstate wire communications to create and manage their scheme, which involved nationwide distribution of the MS Drugs through ACS at the direction of Biogen.  Biogen communicated with ACS, US Bioservices, and the foundations through the mail and wires, causing thousands of reimbursement requests to be submitted to Humana over the wires or by mail, and used the wires and mail to effectuate their receipt of payments and contributions.  For example, from 2011 through 2019, ACS submitted requests to Humana for reimbursement of more than 76,000 prescriptions worth nearly $350 million for the MS Drugs using the wires or the mail.

### G.  Damages

81.     As a result of Biogen's multipronged scheme to inflate the MS Drugs' price and utilization, Humana incurred significant losses.  A substantial portion of Humana's business is evaluating, underwriting, and managing risks involved in insuring healthcare costs.  As an insurer, Humana bears significant risks associated with utilization and pricing of expensive drugs.

82.     Biogen's scheme was designed to cause, and did cause, Humana and others to pay for the MS Drugs prescriptions that it would otherwise not have reimbursed, and to pay more for prescriptions than it otherwise might have paid.  Humana was among the group of health insurers who were the targets of Biogen's scheme.  Biogen and its co-conspirators knew that nearly all of Biogen's subject MS Drugs in the United States would be sold to patients with prescription drug insurance that would pay most of the drug's cost.  Humana's insurance plans bore the vast

majority of the MS Drugs' costs for Humana members.  Humana was directly injured as a result of Biogen's and its co-conspirators' illegal conduct.

83.     But for the scheme, Humana would have paid for fewer MS Drugs prescriptions (and associated costs of administering the drug), and it would have paid less for each covered prescription.  Similarly, but for Biogen's kickbacks, Humana would not have been defrauded by Biogen's and ACS's false certifications of compliance with federal and state law through submissions for reimbursements for prescriptions for the MS Drugs.

84.     From 2011 through 2019, Humana paid over $1.9 billion for the MS Drugs prescriptions, with ACS accounting for nearly $350 million of that spending.  Humana incurred additional amounts for provider visits associated with administering the drugs, especially for administration of Tysabri, which requires an infusion that generally takes place at a hospital, doctor's office, infusion center, or other facility outside of the home.  In the absence of Biogen's and its collaborators' conduct, Humana would have paid substantially less.  Humana has also incurred administrative, investigative, legal, and other costs as a result of the conduct of Biogen and its co-conspirators.

85.     Humana has the relevant information to identify only a fraction of the insureds whose copayments Biogen directly subsidized through CDF and TAF.  A significant number of claims for Avonex and Tecfidera prescriptions that were filled directly through Humana's own specialty pharmacy received copayment funding through either CDF or TAF during the relevant period.  (Exhibit A, attached, contains information on a sample of 100 such claims for the prescriptions filled through Humana's specialty pharmacy using copayment assistance from CDF and TAF.)  For many more claims where prescriptions were filled through other specialty pharmacies, such as ACS, Humana lacks access to sufficient information to know whether the

copayment was paid by CDF or TAF.  Those claims for which it lacks data on copayment subsidies represent the majority of Humana's spending on the MS Drugs.

### H. Fraudulent Concealment of the Illegal Scheme

86.     Biogen actively concealed the existence of its illegal scheme and the acts underlying it through false or misleading statements.  Biogen concealed its arrangements with CDF and TAF intentionally, and with knowledge of their illegality.  CDF and TAF took steps to disguise the sources of funds they received and to disguise the intent of their donors, suggesting that those donations were made for the benefit of any multiple sclerosis drug, when in fact they were methodically calculated, timed, and coordinated with ACS to provide support only for patients who were prescribed the Biogen MS Drugs.  Biogen did this while certifying to Humana that it was following federal law and CMS rules that prohibited such copayment subsidies for Medicare patients.  ACS knowingly aided, abetted, facilitated, and joined in that illegal conduct.

87.     The fraudulent concealment prevented Humana from discovering this conduct. Humana remained unaware of it until the United States Department of Justice brought these acts and practices to light through investigations, legal actions, and/or settlements.  Most of the specifics of Biogen's scheme are still unknown to Humana.  Other than vague hints of Biogen's misconduct, Humana was not aware, and could not have discovered, specifics about Biogen's conduct or scheme until December 17, 2020, when DOJ's complaint in *United States ex rel. Paul Nee v. Biogen, Inc., et al.*, No. 17-cv-10192-MLW (D. Mass.), was unsealed.

**COUNT I**
**VIOLATION OF THE RICO ACT, 18 U.S.C. § 1962(c)**

88.     Humana incorporates by reference paragraphs 1–87 of this Complaint as though fully stated in this paragraph.

89.     Defendants are "person[s]" within the meaning of 18 U.S.C. § 1961(3), who conducted the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

90.     Defendants designed and coordinated a multifaceted scheme (the "MS Drugs Enterprise") intended to charge and maintain inflated prices for the MS Drugs, including through a conspiracy to defraud payors such as Humana.  The scheme consisted of illicit "seeding" of patients through the provision of free drugs, "sweeps" of patients in the free-drug program to Medicare and related coverage eligibility, and patient copay subsidies through sham charitable funds.

91.     As described above, this pattern of conduct continued for years, and would have continued but for the investigations, legal actions, and/or settlements of federal authorities.

92.     The MS Drugs Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4), consisting of Biogen, ACS, CDF, TAF, and US Bioservices—including their corporate parents, siblings, subsidiaries, employees, and agents.  The MS Drugs Enterprise was an ongoing organization that functioned as a continuing unit.  The MS Drugs Enterprise was created and/or used as a tool to effectuate a pattern of racketeering activity.  Biogen, ACS, CDF, TAF, and US Bioservices are each "persons" distinct from the MS Drugs Enterprise.

93.     Biogen established the MS Drugs Enterprise to fraudulently increase its sales of the MS Drugs.  Biogen subsidized copays through CDF and TAF in exchange for an increased rate of prescriptions of the MS Drugs in lieu of less expensive treatment.  Defendants knew that their scheme violated federal and state laws.

94.     Every Defendant and each of the co-conspirators knowingly participated in the MS Drugs Enterprise and conducted the activities relevant to their respective roles in the scheme.

Generally, Biogen provided contributions to the foundations with the knowledge and intention that its contributions would be used for copay support for the MS Drugs only.  ACS coordinated information from CDF and TAF so that Biogen could calculate the donations used for the MS Drugs support, and it steered patients toward the foundation assistance programs.  CDF and TAF understood, agreed to, and did use Biogen's donations to fund copay assistance only for patients of the MS Drugs rather than other multiple sclerosis drugs, and it provided information to ACS to enable Biogen to calculate the specific amount of those donations.  US Bioservices shipped free MS Drugs to patients, including by shipping extended supplies to transition patients from the free-drug program to the copay assistance programs.

95.     False representations of compliance with federal and state laws were made to Humana for payment over the wires or by mail.  These false representations were made directly to Humana and were a condition of reimbursement for all the MS Drugs claims submitted to Humana.  The illegally obtained payments were sought through, and sent over, the wires or by mail.  The claims for reimbursement submitted for payment to Humana over the wires or by mail identified in Exhibit A attached to this Complaint are examples of the MS Drugs Enterprise's fraud on Humana.

96.     The MS Drugs Enterprise engaged in and affected interstate commerce because, among other things, it marketed, sold, purchased, or provided the MS Drugs to thousands of individuals throughout the United States.

97.     Biogen has asserted control over the MS Drugs Enterprise by designing, organizing, coordinating and funding the phony charitable funds at CDF and TAF used for the MS Drugs copays.

98.     Biogen has conducted, and Defendants and their co-conspirators participated in, the affairs of the MS Drugs Enterprise through a pattern of racketeering activity that includes acts indictable under 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and 1952 (use of interstate facilities to conduct unlawful activity).

99.     The effect of Defendants' and their co-conspirators' racketeering activity was to induce sales of the MS Drugs that otherwise would not have been made in the absence of the illegal conduct and to maintain or raise the price of the MS Drugs to a higher level than it would have commanded in the absence of the illegal conduct.

100.    Humana suffered injuries when it reimbursed those prescriptions for the MS Drugs that otherwise would not have been filled, submitted, or reimbursed and/or it would not have paid the higher prices that resulted from the illegal conduct.

101.    Humana's injuries were directly and proximately caused by Defendants' and their co-conspirators' racketeering activities.

102.    By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are jointly and severally liable to Humana for three times the damages Humana has sustained, plus the cost of this suit, including reasonable attorneys' fees.

### COUNT II
### CONSPIRACY TO VIOLATE THE RICO ACT, 18 U.S.C. § 1962(d)

103.    Humana incorporates by reference paragraphs 1–87 of this Complaint as though fully stated in this paragraph.

104.    18 U.S.C. § 1962(d) provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

105.    Defendants and their co-conspirators have violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).  The object of this conspiracy has been and is to

conduct or participate in, directly or indirectly, the conduct of the affairs of the MS Drugs Enterprise through a pattern of racketeering activity.

106.    Defendants and their co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Humana of money.

107.    The nature of the conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation by conspiring to violate 18 U.S.C. § 1962(c), but also that they were aware that their ongoing fraudulent and extortionate acts have been and are part of an overall pattern of racketeering activity.

108.    As a direct and proximate result of Defendants' and their co-conspirators' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Humana has been injured in its business and property as set forth more fully above.

109.    Defendants and their co-conspirators have sought to and have engaged in the commission of overt acts, including the following unlawful racketeering predicate acts:

    a.  Multiple instances of mail fraud in violation of 18 U.S.C. §§ 1341 and 1346; and

    b.  Multiple instances of wire fraud in violation of 18 U.S.C. §§ 1343 and 1346.

110.    The purpose and effect of the conspiracy was to induce sales of the MS Drugs that otherwise would not have been made in the absence of the illegal conduct and to maintain or raise the price of the MS Drugs to a higher level than it would have commanded in the absence of the illegal conduct, and thereby to create profits that could be shared among the conspirators.

111.     Humana suffered injuries when it reimbursed those prescriptions for the MS Drugs that otherwise would not have been filled or submitted, and/or would not have paid the higher prices that resulted from the illegal, conspiratorial conduct.

112.     Humana's injuries were directly and proximately caused by Defendants' and their co-conspirators' racketeering activities.

113.     By virtue of these violations of 18 U.S.C. § 1962(d), Defendants are jointly and severally liable to Humana for three times the damages Humana has sustained, plus the cost of this suit, including reasonable attorneys' fees.

## COUNT III
## STATE UNFAIR COMPETITION LAW CLAIMS

114.     Humana incorporates by reference paragraphs 1–87 of this Complaint as though fully stated in this paragraph.

115.     Defendants have engaged in fraudulent and deceptive business practices that violate the state unfair competition laws of Alaska, Arizona, Arkansas, California, Connecticut, Florida, Idaho, Illinois, Indiana, Louisiana, Massachusetts, Michigan, Nebraska, New Hampshire, New Mexico, North Carolina, North Dakota, Oregon, South Carolina, Tennessee, Washington, and Wyoming.

116.     Defendants have engaged in unfair competition under the states' laws by unlawfully making and accepting remuneration in exchange for the sale of the MS Drugs to Humana and its members in consumer transactions.  This conduct violated the federal Anti-Kickback Statute and equivalent state statutes and caused the certifications of compliance with law provided to Humana to be fraudulent.

117.    Humana was directly and proximately injured by Defendants' and their co-conspirators' conduct and would not have paid what it did for the MS Drugs had they fully disclosed their schemes.

118.    Defendants and their co-conspirators engaged in wrongful conduct while at the same time obtaining under false pretenses a significant sum of money from Humana.  Humana suffered injury in fact and actual damages, including lost money and property as a result of Defendants' and their co-conspirators' violations of the following statutes:

 a. **Alaska.**  Defendants have engaged in unfair methods of competition in the conduct of trade or commerce, in violation of **Alaska Stat. § 45.50.471(a)**, *et seq.*  Humana suffered an ascertainable loss of money and/or property as a result of Defendants' unfair methods of competition.

 b. **Arizona.**  Defendants have engaged in unfair acts or practices in connection with the sale of the MS Drugs, in violation of **Ariz. Rev. Stat. Ann. § 44-1521**, *et seq.*  Humana has suffered damages as a result of Defendants' unfair acts or practices.

 c. **Arkansas.**  Defendants have engaged in unconscionable trade practices in violation of **Ark. Code Ann. § 4-88-101**, *et seq.*  Humana has suffered an actual financial loss as a result of Defendants' use of such practices, and Humana's loss was proximately caused by those practices.

 d. **California.**  Defendants have engaged in unlawful, unfair, and fraudulent business practices in violation of **Cal. Bus. & Prof. Code § 17200**, *et seq.*  Humana has suffered a loss or deprivation of money or property that was the result of Defendants' unlawful, unfair, and fraudulent business practices.

 e. **Connecticut.**  Defendants have engaged in unfair methods of competition and/or unfair acts or practices in the conduct of trade or commerce, in violation of **Conn. Gen. Stat. § 42-110a**, *et seq.*  Humana has suffered an ascertainable loss of money or property as a result of Defendants' unfair methods, acts, and/or practices.

 f. **Florida.**  Defendants have engaged in unfair methods of competition, unconscionable acts or practices, and/or unfair acts or practices in the conduct of trade or commerce, in violation of **Fla. Stat. § 501.201**, *et seq.*  Humana has suffered a loss as a result of Defendants' violations.

 g. **Idaho.**  Defendants have engaged in unfair methods of competition and/or unfair acts or practices in the conduct of trade or commerce, in violation of

**Idaho Code Ann. § 48-601**, *et seq.*  Humana has suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unlawful methods, acts, or practices.

h. **Illinois.**  Defendants have engaged in unfair methods of competition in violation of **815 Ill. Comp. Stat. 505/1**, *et seq.*  Defendants' unfair methods of competition involved trade practices that were addressed to the market generally.

i. **Indiana.**  Defendants have engaged in unfair acts or practices in violation of **Ind. Code § 24-5-0.5-1**, *et seq.*, in connection with consumer transactions.

j. **Louisiana.**  Defendants have engaged in unfair methods of competition in violation of **La. Rev. Stat. Ann. § 51:1401**, *et seq.*  Humana has suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unfair acts or practices.

k. **Massachusetts.**  Defendants have engaged in unfair methods of competition in violation of **Mass. Gen. Laws Ann. ch. 93A, § 1**, *et seq.*  Humana engages in the conduct of commerce and has suffered a loss of money or property as a result of Defendants' unfair methods of competition.

l. **Michigan.**  Defendants have engaged in unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce in violation of **Mich. Comp. Laws § 445.901**, *et seq.*  Humana has suffered a loss as a result of Defendants' unlawful acts or practices.

m. **Nebraska.**  Defendants have engaged in unfair methods of competition in violation of **Neb. Rev. Stat. § 59-1601**, *et seq.*  Humana has been injured in its property by Defendants' unfair methods of competition.

n. **New Hampshire.**  Defendants have engaged in unfair methods of competition in violation of **N.H. Rev. Stat. Ann. § 358-A:1**, *et seq.*  Humana has been injured by Defendants' use of unlawful methods, acts, or practices.

o. **New Mexico.**  Defendants have engaged in unfair trade practices and/or unconscionable trade practices in the conduct of trade or commerce, in violation of **N.M. Stat. Ann. § 57-12-1**, *et seq.*  Humana has suffered a loss of money or property as a result of Defendants' employment of unlawful methods, acts, or practices.

p. **North Carolina.**  Defendants have engaged in unfair methods of competition in or affecting commerce, in violation of **N.C. Gen. Stat. § 75-1.1**, *et seq.*  Humana has been injured by reason of Defendants' violations of this statute.

q. **North Dakota.**  Defendants have engaged in unconscionable and/or substantially injurious acts or practices in connection with the sale of the MS Drugs, in violation of **N.D. Cent. Code § 51-15-01**, *et seq.*  Defendants have

acquired moneys and/or property from Humana by means of Defendants' unlawful practices.

r.  **Oregon.**  Defendants have engaged in unconscionable acts in connection with the sale of the MS Drugs, in violation of **Or. Rev. Stat. 646.607,** *et seq.* Humana has suffered an ascertainable loss of money or property as a result of Defendants' willful use or employment of unlawful methods, acts, or practices.

s.  **South Carolina.**  Defendants have engaged in unfair methods of competition in violation of **S.C. Code Ann. § 39-5-10,** *et seq.*  Humana has suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unfair methods, acts, or practices.

t.  **Tennessee.**  Defendants have engaged in unfair acts or practices affecting trade or commerce in violation of **Tenn. Code Ann. § 47-18-101,** *et seq.* Humana has been the victim of Defendants' unfair acts in the course of trade or commerce.

u.  **Washington.**  Defendants have engaged in unfair methods of competition in violation of **Wash. Rev. Code § 19.86.010,** *et seq.*  Humana has been injured in its business or property by Defendants' violation of this statute.

v.  **Wyoming.**  Defendants have engaged in unfair acts or practices in violation of **Wyo. Stat. Ann. § 40-12-101,** *et seq.*  Humana has suffered damages as a result of Defendants' unlawful trade practices.

119.    Pursuant to these states' laws, Humana seeks judgment in its favor and against Defendants requiring Defendants to pay restitution of wrongful profits, revenues, and benefits received as a result of the MS Drugs schemes.

<u>**COUNT IV**</u>
**STATE CONSUMER FRAUD AND**
**DECEPTIVE TRADE PRACTICE LAW CLAIMS**

120.    Humana incorporates by reference paragraphs 1–87 of this Complaint as though fully stated in this paragraph.

121.    Defendants have engaged in fraudulent and deceptive business practices that violate the state consumer fraud, consumer protection, and/or deceptive trade practices laws of Arizona, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Illinois, Indiana,

Louisiana, Massachusetts, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, North

Carolina, South Carolina, Tennessee, and Wisconsin, and in particular the following laws:

a. **Arizona.**  Defendants have engaged in deceptive acts or practices in connection with the sale of the MS Drugs, in violation of **Ariz. Rev. Stat. Ann. § 44-1521,** *et seq.*  Humana has suffered damages as a result of Defendants' deceptive acts or practices.

b. **Arkansas.**  Defendants have engaged in deceptive trade practices in violation of **Ark. Code Ann. § 4-88-101,** *et seq.*  Humana has suffered an actual financial loss as a result of Defendants' use of such practices.

c. **California.**  Defendants have engaged in unlawful, unfair, and fraudulent business practices in violation of **Cal. Bus. & Prof. Code § 17200,** *et seq.*  Humana has suffered a loss or deprivation of money or property that was the result of Defendants' unlawful, unfair, and fraudulent business practices.

d. **Colorado.**  Defendants have engaged in deceptive trade practices in violation of **Colo. Rev. Stat. § 6-1-101,** *et seq.*  Humana has been injured as a result of Defendants' deceptive trade practices.

e. **Connecticut.**  Defendants have engaged in deceptive acts or practices in the conduct of trade or commerce, in violation of **Conn. Gen. Stat. § 42-110a,** *et seq.*  Humana has suffered an ascertainable loss of money or property as a result of Defendants' deceptive acts or practices.

f. **Florida.**  Defendants have engaged in deceptive acts or practices in the conduct of trade or commerce, in violation of **Fla. Stat. § 501.201,** *et seq.*  Humana has suffered a loss as a result of Defendants' violations.

g. **Georgia.**  Defendants have engaged in deceptive acts or practices in the conduct of consumer transactions, in violation of **Ga. Code Ann. § 10-1-390,** *et seq.*  Humana has suffered injury and/or damages as a result of Defendants' violation of this statute.

h. **Illinois.**  Defendants have engaged in deceptive acts or practices in violation of **815 Ill. Comp. Stat. 505/1,** *et seq.*  Defendants' deceptive acts or practices involved trade practices that were addressed to the market generally.

i. **Indiana.**  Defendants have engaged in deceptive acts or practices in violation of **Ind. Code § 24-5-0.5-1,** *et seq.,* in connection with consumer transactions.

j. **Louisiana.**  Defendants have engaged in deceptive acts or practices in violation of **La. Rev. Stat. Ann. § 51:1401,** *et seq.*  Humana has suffered an ascertainable loss of money or property as a result of Defendants' use or employment of deceptive acts or practices.

k.  **Massachusetts.**  Defendants have engaged in deceptive acts or practices in violation of **Mass. Gen. Laws Ann. ch. 93A, § 1,** *et seq.*  Humana engages in the conduct of commerce and has suffered a loss of money or property as a result of Defendants' deceptive acts or practices.

l.  **Michigan.**  Defendants have engaged in deceptive methods, acts, or practices in the conduct of trade or commerce in violation of **Mich. Comp. Laws § 445.901,** *et seq.*  Humana has suffered a loss as a result of Defendants' unlawful acts or practices.

m.  **Minnesota.**  Defendants have engaged in fraud, misrepresentation, misleading statements and/or deceptive practices, with the intent that others rely thereon in connection with the sale of the MS Drugs, in violation of **Minn. Stat. § 325F.68,** *et seq.*

n.  **Nebraska.**  Defendants have engaged in deceptive acts or practices in violation of **Neb. Rev. Stat. § 59-1601,** *et seq.*  Humana has been injured in its property by Defendants' deceptive acts or practices.

o.  **Nevada.**  Defendants have engaged in deceptive trade practices in violation of **Nev. Rev. Stat. § 41.600,** *et seq.*

p.  **New Hampshire.**  Defendants have engaged in deceptive acts or practices in violation of **N.H. Rev. Stat. Ann. § 358-A:1,** *et seq.*  Humana has been injured by Defendants' use of unlawful methods, acts, or practices.

q.  **North Carolina.**  Defendants have engaged in deceptive acts or practices in or affecting commerce, in violation of **N.C. Gen. Stat. § 75-1.1,** *et seq.*  Humana has been injured by reason of Defendants' deceptive acts or practices.

r.  **South Carolina.**  Defendants have engaged in deceptive acts or practices in violation of **S.C. Code Ann. § 39-5-10,** *et seq.*  Humana has suffered an ascertainable loss of money or property as a result of Defendants' use or employment of deceptive methods, acts, or practices.

s.  **Tennessee.**  Defendants have engaged in deceptive acts or practices affecting trade or commerce in violation of **Tenn. Code Ann. § 47-18-101,** *et seq.*  Humana has been the victim of Defendants' deceptive acts in the course of trade or commerce.

t.  **Wisconsin.**  Defendants and their agents have made unfair, deceptive and/or misleading statements in connection with their sales of the MS Drugs to Humana and its members in violation of **Wis. Stat. § 100.18,** *et seq.*  Humana has suffered monetary damages as a result of Defendants' deceptive unfair, deceptive and/or misleading statements.

122.    Humana is a person or consumer entitled to protection under the foregoing state laws.

123.    Defendants and their co-conspirators misrepresented to Humana that they were complying with federal and state laws, including laws against kickbacks and false claims to the government.

124.    Defendants and their co-conspirators intended for payors, such as Humana, to rely on these certifications.  The intention may be inferred by the very nature of the representation, whose sole purpose is to procure payment for the MS Drugs.

125.    These representations and certifications were made in an effort by Defendants to sell the MS Drugs to the consuming public, and were addressed to the market generally by having the MS Drugs paid for at inflated prices by Medicare, Medicaid, and third-party payors, such as Humana.  The ultimate consequence of this conduct is a significant injury to the consuming public by, among other things, imposing additional costs on the taxpaying public for Medicare and raising the cost of insurance.

126.    Humana relied on these misrepresentations, which were material to its decision to pay for the MS Drugs treatments, to its detriment.

127.    Humana was directly and proximately injured by Defendants' conduct, suffered an injury in fact, and suffered actual, ascertainable damages.  Humana would not have paid for as many of the MS Drugs prescriptions, and/or would have paid less for each covered prescription, had Defendants refrained from engineering the false representations or otherwise disclosed their schemes.

128.    Defendants' conduct offends established public policy and the public interest, and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

## COUNT V
## STATE INSURANCE FRAUD CLAIMS

129.    Humana incorporates by reference paragraphs 1–87 of this Complaint as though fully stated in this paragraph.

130.    Defendants have committed insurance fraud in violation of the laws of Illinois, Kentucky, Pennsylvania, New Jersey, and Tennessee, and in particular the following laws:

a.    **Illinois.**  In violation of **720 Ill. Comp. Stat. 5/17-10.5**, Defendants knowingly obtained, attempted to obtain, or caused to be obtained, by deception, control over the property of Humana by the making of false claims or by causing false claims to be made on policies of insurance issued by Humana, intending to deprive Humana permanently of the use and benefit of that property.

b.    **Kentucky.**  In violation of **Ky. Rev. Stat. § 304.47-010,** *et seq.*, Defendants knowingly and with intent to defraud or deceive presented or caused to be presented, or prepared with knowledge or belief that they would be presented to Humana, written or oral statements as part of, or in support of, claims for payment or other benefits pursuant to insurance policies issued by Humana. Defendants made such statements knowing the statements contained false, incomplete, or misleading information concerning facts of things material to the claims.  Humana was damaged as a result of Defendants' violations.

c.    **Pennsylvania.**  In violation of **18 Pa. Cons. Stat. Ann. § 4117**, Defendants knowingly and with the intent to defraud Humana presented or caused to be presented to Humana statements forming parts of, or in support of, claims that contained false, incomplete or misleading information concerning facts or things material to the claims.  Humana was damaged as a result of Defendants' violations.

d.    **New Jersey.**  In violation of **N.J. Stat. § 17:33A,** *et seq.*, Defendants presented or caused to be presented written or oral statements as part of, or in support of or opposition to, claims for payment or other benefits pursuant to insurance policies, knowing that the statements contained false or misleading information concerning facts or things material to the claims.  Humana was damaged as a result of Defendants' violations.

e.    **Tennessee.**  In violation of **Tenn. Code Ann. § 56-53-101,** *et seq.*, Defendants presented, caused to be presented, or prepared with knowledge or belief that they would be presented, by or on behalf of insureds to Humana in connection with insurance transactions, information Defendants knew to contain false representations, or representations the falsity of which Defendants recklessly disregarded, as to material facts, or withheld or

concealed material facts, concerning claims for payments or benefits pursuant to insurance policies.

131.    Defendants knowingly presented or caused to be presented to Humana statements in support of claims for insurance benefits for the MS Drugs that they knew contained false and/or misleading information.  Defendants knew and intended that by engaging in their schemes to illegally subsidize copayments through phony charitable funds that misleading and/or false information would be submitted to Humana and other Medicare payors in connection with insurance claims.  Defendants knew that the presentation of false claims to Humana was essential to their scheme.

132.    The compliance certifications and other information submitted to Humana were material to Humana's decision to reimburse claims for the MS Drugs.  Without them, Humana would not to have paid these claims.

133.    Humana's injuries were directly and proximately caused by the false or misleading statements that Defendants made to it, or caused to be submitted to it, as described above.

## COUNT VI
## BREACH OF CONTRACT

134.    Humana incorporates by reference paragraphs 1–87 of this Complaint as though fully stated in this paragraph.

135.    Humana Inc. and Biogen are parties to a contract with an effective date of January 1, 2006 in which Humana promised to cover Biogen's MS Drugs on its commercial (non-Medicare) insurance formulary and provide it with a preferred position.  In exchange, Biogen agreed to pay rebates on Humana's purchases of the MS Drugs.

136.    In connection with the agreement, Biogen agreed that it "shall comply with any and all applicable federal, state and local laws, regulations and ordinances, including without

limitation . . . (iii) all federal and state health care anti-fraud and abuse laws; (iv) all state drug product selection, dispensing, pharmacy practice, privacy, and consumer protection laws . . . ; and (v) all rules and regulations of the U.S. Food and Drug Administration (FDA) and the Center for Medicare and Medicaid Services."

137.    During the relevant period, Humana and Biogen entered into subsequent agreements under the same or materially similar terms.

138.    Biogen breached its promise to comply with the laws relating to fraud, abuse, false claims and prohibition of kickbacks when it engaged in the copayment scheme described in this Complaint.

139.    As a result of that breach, Humana has been injured and has suffered damages.

## COUNT VII
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

140.    Humana incorporates by reference paragraphs 1–87 of this Complaint as though fully stated in this paragraph.

141.    Humana had valid and enforceable written contracts with each of its members who were prescribed the MS Drugs during the relevant period.  Humana offers plans to individuals and families, groups and employers, and Medicare and Medicaid beneficiaries. Humana has numerous insurance contracts with its insured members which vary by state and by plan type.  *See, e.g.*, https://www.humana.com/individual-and-family/products-and-services/medical-plans/sample-policies.  Humana's insurance plans require the *insured person(s)* to pay a copayment or other cost-sharing amount when obtaining medical products or services, including prescription medications.  *See, e.g.*, Exhibit B at 131 ("*Copayment* means the **amount to be paid by *you*** toward the cost of each separate prescription or refill of a covered prescription drug"); *id.* ("*Cost share* means any *copayment*, *deductible*, *drug deductible*, and/or percentage

amount that *you* **must pay per prescription drug or refill per year**.); *id.* at 131 ("**You are responsible for any and all** *cost share***, when applicable, for** *specialty drugs*, according to the 'Schedule of benefits – specialty drugs' provision of this section."); *id.* at 131-135 ("***You* are responsible for the following** . . . [**25-50%**] *copayment* per *specialty drug prescription* or refill"); *id.* at 134 ("If the *cost share* applied to *your* claim is waived by *your pharmacy* or health care provider, *you* **are required to inform us. Any amount, thus waived and <u>not</u> paid by** *you*, **would <u>not</u> apply to any** *out-of- pocket limit***.**") (italics and underline in original, bold added). The purpose of this copayment or cost sharing obligation is to provide an incentive to members to exercise patient responsibility for healthcare costs, and so to help control healthcare spending and manage runaway drug price inflation.

142.    Under its contracts, Humana also retains the right to determine whether and how much of a claim should be paid for prescription drugs based, in part, on "Medicare laws, regulations, manuals, and other related guidance" pursuant to its procedures for claims processing. *Id.* at 10 (describing Humana's ability to make "claims processing edits"). Humana notes that the list of specialty drugs covered by its plan is "subject to change without notice." *Id.* at 132.

143.    This copayment obligation was known to Biogen and ACS. Biogen accounted for copayment obligations in its sales and marketing strategy. ACS was aware of Humana members' copayment obligations through its role as manager of Biogen's MS Drugs and/or because it directly collected these copayments from Humana's members when filling prescriptions.

144.    Defendants intended to and did induce Humana members to breach their obligations by making copayments for them.

145.     Humana was harmed by these breaches because it reimbursed claims for the MS Drugs that otherwise would not have been made.

146.     Defendants have intentionally and willfully interfered with the contracts between Humana and its members.  This interference was a significant factor in causing the breach of the contracts.  This interference was improper, lacked justification, and was not a legitimate part of the business of Biogen or ACS.

147.     Humana suffered actual damages as a result of this interference, both by paying for more prescriptions for the MS Drugs than it otherwise would have, and by paying more for each covered prescription.

148.     Humana seeks judgment in its favor and against Defendants, requiring Defendants to pay monetary and punitive damages for their conduct.

## COUNT VIII
### FRAUD

149.     Humana incorporates by reference paragraphs 1–87 of this Complaint as though fully stated in this paragraph.

150.     Defendants have engaged in a pattern of fraudulent conduct that has occurred over an extended period of time.  Because of the nature of the fraud and the number of acts constituting the fraud, Humana lacks detailed knowledge of all the circumstances surrounding the fraud.  Nevertheless, Humana has identified certain instances, including those listed in Exhibit A attached to this Complaint, as examples of Defendants' fraudulent conduct.

151.     Defendants schemed to mislead Humana through both false statements and fraudulent omissions.  The false statements were in the form of certifications from Biogen and ACS that were transmitted to Humana in the form of electronic requests for reimbursement of prescription drug costs for the MS Drugs.  TAF and CDF made misstatements or omissions in

their communications with Humana involving material facts regarding their charitable purpose, Biogen being the source of their copayment assistance funds used for the MS Drugs, and the circumstances under which CDF and TAF acquired those funds from Biogen.  Defendants knew that those statements were false and that their omissions were material to Humana in its decisions whether to reimburse claims for the MS Drugs prescriptions.

152.    By submitting claims and providing copayment subsidies while omitting material information, Defendants intended to and did induce Humana's reliance on their statements when making decisions regarding coverage and filling of the MS Drugs prescriptions for its insureds.

153.    Humana was damaged by acting in reliance on this false, misleading, omitted, or incomplete information.  Defendants and their co-conspirators gained a benefit by selling, filling, or earning administrative fees on subsidies for the MS Drugs prescriptions that they otherwise would not have received had they been honest and forthright.

## COUNT IX
## CONSPIRACY TO COMMIT FRAUD

154.    Humana incorporates by reference paragraphs 1–87 of this Complaint as though fully stated in this paragraph.

155.    There was an agreement between Biogen and its co-conspirators to obtain funds by fraudulent means, including as more particularly described in Count VIII of this Complaint.

156.    Biogen and its co-conspirators committed overt acts in pursuance of the conspiracy, including but not limited to the timing and coordination of patient referrals, donations, and administrative fee payments.

157.    Humana suffered damage as a result of the acts done under the conspiracy.

## COUNT X
## UNJUST ENRICHMENT

158.     Humana incorporates by reference paragraphs 1–87 of this Complaint as though fully stated in this paragraph.

159.     As the intended and expected result of their conscious wrongdoing as set forth in this Complaint, Defendants and their co-conspirators have profited and benefited from payments Humana made for the MS Drugs as a result of their schemes.

160.     The circumstances of Defendants' receipt of monies based on the conduct set forth in this Complaint are such that, in equity and good conscience, Defendants should not retain such monies, the amount of which is to be determined at trial.

161.     Humana is entitled in equity to seek restitution of Defendants' wrongful profits, revenues, and benefits received as a result of their schemes.

162.     Humana states this claim to the extent that it is deemed not to have an adequate legal remedy.

## PRAYER FOR RELIEF

163.     Based on the foregoing, Humana requests that the Court enter an order that:

    a.   Enters judgment in favor of Humana and against the Defendants;

    b.   Awards Humana its actual damages in an amount to be determined at trial;

    c.   Awards Humana punitive damages;

    d.   Awards Humana treble damages under 18 U.S.C. § 1964(c) or any other provision of law, including state law, that permits doubling or trebling of damages;

    e.   Awards Humana its attorneys' fees and litigation costs under 18 U.S.C. § 1964(c), or any other provision of law, including state law, that permits recovery of such costs and fees;

    f.   Awards Humana pre-and post-judgment interest; and

    g.   Provides any other relief that the Court deems proper.

## JURY DEMAND

164.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

Dated: September 24, 2021                By:      /s/ *Justin P. O'Brien*

Justin P. O'Brien (BBO #658765)
William J. Lovett (BBO #643525)
LOVETT O'BRIEN LLP
1 Beacon Street, Suite 1320
Boston, MA 02108
617-603-0748 phone
617-314-0447 fax
Email: jobrien@lovettobrien.com
            wlovett@lovettobrien.com

Scott C. Solberg*
James W. Joseph*
Benjamin E. Waldin*
EIMER STAHL LLP
224 South Michigan Ave., Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
Fax: (312) 692-1718
Email: ssolberg@eimerstahl.com
        jjoseph@eimerstahl.com
        bwaldin@eimerstahl.com

*Pro hac vice* application forthcoming

*Attorneys for Plaintiff Humana Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 24, 2021.

By: _/s/ Justin P. O'Brien_

Justin P. O'Brien (BBO #658765)
LOVETT O'BRIEN LLP
1 Beacon Street, Suite 1320
Boston, MA 02108
617-603-0748 phone
617-314-0447 fax
Email: jobrien@lovettobrien.com